COMMONWEALTH vs. SUZANNE MARIE LANAGAN.

No. 00-P-1140.

Franklin. September 18, 2002. - December 5, 2002.

Present: GREENBERG, SMITH, & GELINAS, JJ.

*Burning a Dwelling House. Insurance,* Burning of insured property, Defrauding insurer. *Practice, Criminal,* Required finding, Assistance of counsel. *Constitutional Law,* Assistance of counsel.

The evidence at a criminal trial was sufficient to warrant a rational trier of fact's conclusion beyond a reasonable doubt that the defendant committed arson of a dwelling house, in violation of G. L. c. 266, § 1, and wilfully burned an insured building with intent to defraud an insurer, in violation of G. L. c. 266, § 10, where the prosecution forged a sufficient chain of circumstances, composed of evidence of motive, opportunity, control of the premises, increase in insurance, concealment, and misleading statements, to allow the jury to find that the defendant and her husband had wilfully and maliciously set the fire with the intent to defraud the insurer. [664-666]

At the trial of an indictment charging the defendant with arson of a dwelling house, in violation of G. L. c. 266, § 1, and with wilfully burning an insured building with intent to defraud an insurer, in violation of G. L. c. 266, § 10, the defendant's trial counsel was not ineffective in questioning an expert witness about his opinion that an accelerant had been placed on the basement stairs, where it was incumbent upon counsel to challenge the validity and reliability of the witness's opinion that the fire had started in the basement and was not an accident resulting from unattended cooking in the kitchen. [666-667]

INDICTMENT found and returned in the Superior Court Department on May 11, 1998.

The case was tried before *Bertha D. Josephson*, J.

*Ronald H. Cody* for the defendant.

*Steven Greenbaum*, Assistant District Attorney, for the Commonwealth.

SMITH, J. On May 11, 1998, a Franklin County grand jury returned indictments against Suzanne and James Lanagan, charging them with arson of a dwelling house in violation of

G. L. c. 266, § 1, and wilfully burning an insured building with intent to defraud its insurer in violation of G. L. c. 266, § 10.

On May 20, 1999, after a jury trial, the defendants were found guilty of both charges. Suzanne's motion for new trial or a required finding of not guilty was denied. The defendants appealed, and their appeals were consolidated. Subsequent to such consolidation, James withdrew his appeal.[1] We affirm Suzanne's conviction.

On appeal, Suzanne claims that the judge committed error in denying her motions for required findings of not guilty on both charges. She also contends that her trial lawyer was constitutionally ineffective.

1. *Denial of motions for required findings of not guilty.*

*Facts.* Viewing the facts in the light most favorable to the Commonwealth, as we must, the jury could have found the following facts. *Commonwealth* v. *DePalma*, 41 Mass. App. Ct. 798, 799 (1996). James and Suzanne lived in New Salem in a house that James had inherited from his father. In April of 1997, James obtained a loan of $32,100 from a mortgage company, which included a cash disbursement of $25,000. He also obtained an insurance policy covering the dwelling in the amount of $80,000 and $40,000 for the contents. In August, he tried to increase the coverage on the dwelling but could not because the amount in the policy was at the maximum rebuilding cost.

According to the record, in October of 1997, James borrowed $47,500 from another mortgage company, of which approximately $34,500 was paid to discharge the first mortgage and over $9,000 was disbursed to James. Later that month James increased his contents coverage by changing it to cover the replacement costs of the contents rather than the value of the destroyed property.

James had worked only sporadically since he had obtained the mortgages. Suzanne worked at home, occasionally raising puppies for sale. At the time of the fire, James was two months behind on the mortgage payments and one month behind on his car loan payments.

---

[1]We, however, sometimes refer to "defendants" throughout the opinion.

Before the fire, James and Suzanne told some of their friends of their plans to build a log cabin on the site of their present home. When asked what they planned to do with their present home, James responded that they "were not sure what they were going to do to get rid of the house."

In February of 1998, Suzanne asked a friend for some boxes so she could pack some items that she was removing from the house because she and James planned to "bomb" the house to rid it of ants. Later, either in February or March, Suzanne told friends that the "bombing" was not successful and that it would have to be repeated.

On March 8, 1998, James leased a storage unit in New Hampshire for a two-month period. He informed the proprietor that he was storing household goods and moving to the area. Suzanne accompanied James to the storage unit on at least one occasion.

At approximately 3:00 P.M. on March 18, 1998, volunteer firefighters for the New Salem fire department responded to calls that smoke was seen coming from James's and Suzanne's home. When firefighters arrived at the property, they observed smoke coming out of the eaves, and peering inside, they could see thick black smoke, but no flames. Several windows were broken in order to vent the smoke and to permit water to be directed into the house. It took several hours to extinguish the fire.

About twenty-five to thirty minutes after the firefighters were alerted, James walked up to the house, leading a horse. He appeared puzzled or shocked when a volunteer firefighter told him that the house was on fire. James, as a volunteer firefighter, was wearing a pager and told Justin McGrath, another volunteer firefighter, that he had heard the page, but had thought it was for the brush fire for which James had been issued a permit. James explained that one of his two horses had run away before the fire and that he went after it. He told a neighbor that "everything was gone" and that "everything I owned was in there."

Sometime thereafter, Suzanne arrived at the scene. She was "very shaken up" and crying. By the time the fire was brought under control, the house had been destroyed.

Later that evening, Fire Chief Thomas Reidy spoke with the defendants, and Suzanne explained that she had been cooking stew on the stove and potatoes in a deep fat fryer when one of their two horses ran away. She put her dogs in the car, took the other horse, and went with James to find the runaway horse. Suzanne told Reidy that they had "basically lost everything" and that all she had were the clothes she was wearing. James again said that everything he owned was in the house.

The day after the fire, Suzanne told her friend, Laura Pumiglia, that she had "lost everything," including the crystal that had been a wedding present from Pumiglia. Sometime later, Suzanne told Pumiglia that the crystal had been in storage and was "okay."

On March 19, 1998, State Trooper Christopher Ware and Fire Chief Reidy inspected the site to determine the point of the fire's origin and its cause. Other than an area near the kitchen, the house was completely destroyed, and part of the floor had collapsed into the basement. In the kitchen, which was relatively intact compared to the rest of the building, Trooper Ware found a pan on the stove which contained beef stew. The lower part of the pan, which held the stew, was unaffected by the fire. Because the liquid in the stew had not boiled away, Ware concluded that the pan had not been the cause of the fire. Ware also found the deep fat fryer, holding overcooked potatoes and no liquid, on the counter next to the stove. The deep fat fryer had been damaged by the fire in that some of the metal had been burned away or melted. Because of the extent of the damage sustained by the house, Ware was unable to examine the entire structure and, therefore, could not render an opinion as to the cause and origin of the fire.

On March 19, 1998, James filed an insurance claim for total loss of the house due to the fire. On March 20, 1998, Suzanne and James met with Eric Von Wagoner, an insurance claims adjuster, who came to examine the house. In the area of the master bedroom, Von Wagoner observed a twin or full-size box spring. James told Von Wagoner that it was queen-size. James also corrected Von Wagoner when Von Wagoner indicated that the insurance policy's contents coverage was $40,000, rather

than the $54,000 to which James had had it increased.[2] Von Wagoner told the defendants that he would send them a contents list form on which they could list lost items of property as well as the age and original cost of such items. Von Wagoner never received the form from the defendants. The defendants never mentioned to Von Wagoner that they had other personal possessions stored elsewhere.

On March 31, 1998, State Trooper Gerald Perwak and Dennis Williams, an insurance fire investigator, examined the ruins of the defendants' home. They found that the kitchen was one of the areas that had suffered the least damage. The greatest amount of damage was in the area of the stairwell to the cellar, where the building had collapsed into the basement. The remains of the stairwell were removed and secured. Three of the bottom treads were still present and the damage increased toward the top of the stairway. This pattern of burn indicated to Williams that the fire had burned in the cellar for a significant period and then traveled up the stairwell into the center of the house. The burn pattern on one tread was consistent with a flammable liquid having been poured on it. A supporting beam in the cellar had sustained the greatest amount of fire damage in a section near the top of the cellar stairs, indicating that the fire had burned there for a longer period of time. The area from the center of the building straight up and through the roof had suffered the greatest damage, indicating that the fire had burned vertically, up from the basement.

Williams concluded that the fire originated somewhere in the cellar, at or below the stairwell. He saw no indication that the fire had started in the kitchen. Perwak also concluded that the fire started in the basement. James told Perwak that he did not have any items that were in storage.

John Drugan, a senior chemist at the Massachusetts State police crime laboratory, did not detect the presence of any accelerant when he tested the cellar stairs. Drugan explained that a number of factors might account for the failure to detect an accelerant.

On April 3, 1998, John Law, an electrical investigator for the

---

[2]The correct figure was actually $56,000.

State fire marshal's office, accompanied by State Trooper David Percy, inspected the site and observed that none of the wires inside the panel showed any electrical damage, but that most of the insulation was gone as a result of the exterior heat. Law concluded that the panel wiring had not been a source of the fire. While Law could inspect only about one-third of the remaining house wiring, he found nothing that indicated an abnormal defect or condition that would have caused the fire. Trooper Percy spoke with the defendants on that day. Suzanne told Percy that she had lost everything in the fire.

On April 3, 1998, Trooper Perwak, pursuant to a valid search warrant, entered and searched the storage unit in New Hampshire leased by James. Inside the unit, Perwak found numerous household items, including a dryer; a microwave oven; a humidifier; a stereo; a queen-size bed and mattress; clothing; documents; papers; a couch; a loveseat; a reclining chair; a gas stove; tools; books; magazines; bills; a Whirlpool washing machine; a television; a rocking chair; a vacuum cleaner; a refrigerator; towels; silverware; glass light shades and candle holders; videotapes; crystal wineglasses; tool boxes; envelopes containing photographs, including an envelope marked "James"; a photo album; approximately eighty to one hundred pieces of correspondence with the defendants' names and address; a safe containing paperwork in each defendant's name, including a deed transferring the property from James to James and Suzanne; a saddle; a box spring; a mirror; and boxes of pots, pans, and kitchen utensils.

In June of 1998, Lester McLaughlin inspected the oil tank and oil burner on behalf of an insurance investigation agency. He concluded that the oil burner was neither the cause nor the origin of the fire. A sample of soil taken on June 4, 1998, from an area in the basement where the oil tank had been located was also tested. Number 2 fuel oil, a potential accelerant, was detected in the soil sample.

*Discussion.* Upon review of a denial of a motion for a required finding, the court must determine whether the evidence, appraised in the light most favorable to the Commonwealth, was sufficient to warrant any rational trier of fact to conclude beyond a reasonable doubt that the defendant committed the

crimes with which she was charged. *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979). "[C]ircumstantial evidence is competent to establish guilt beyond a reasonable doubt." *Commonwealth* v. *Gilbert*, 423 Mass. 863, 868 (1996). "Of necessity, proof of arson must often rely on circumstantial evidence because arsonists are furtive criminals." *Commonwealth* v. *Jacobson*, 19 Mass. App. Ct. 666, 674 (1985).

We recognize that there was no expert opinion stating that the fire had been deliberately set. There was evidence, however, that the fire had originated at the foot of the basement stairs, and that neither the oil burner or tank, nor the electrical panel, had accidentally caused the fire. The origin of a fire in a location where accidental causes have been eliminated tends to indicate an incendiary cause. See, e.g., *Commonwealth* v. *Jung*, 420 Mass. 675, 678-679 (1995); *Commonwealth* v. *Jacobson*, *supra* at 669 n.6. In addition, the physical condition of the surviving stairs was consistent with having had a flammable liquid poured on them. Although the chemist failed to detect an accelerant on the stairs at the time he examined the stairs, he explained at trial that several factors could explain the failure to detect an accelerant that had been present at a fire. As such, the jury could have inferred that the fire was intentionally set. See *Commonwealth* v. *Ward*, 14 Mass. App. Ct. 37, 40 (1982).

James's and Suzanne's financial problems provided an incentive for them to burn the house that they owned. For example, the Commonwealth presented evidence that the defendants' principal source of money during the year prior to the fire had been cash disbursement from home mortgages, which totaled over $34,000. They were behind in mortgage and car loan payments and unemployed with no prospects of sufficient income to cover their expenses. Within the past year, the defendants had obtained the maximum insurance coverage on the dwelling, and increased the coverage on its contents. "This evidence strongly suggests a motive." *Commonwealth* v. *DeStefano*, 16 Mass. App. Ct. 208, 216 (1983).

There was also evidence from which the jury could infer that the defendants had anticipated the fire. See *id.* at 217. There was evidence that James had rented storage space in New Hampshire and that valuable contents of their house were placed

in the rented space. Suzanne was aware of the storage space. The jury could infer that the storage unit "was rented to provide storage space for items which the defendant[s] chose not to sacrifice to the intended fire . . . ." *Ibid.* Furthermore, both James and Suzanne made false and misleading statements about the "total loss" of their property as a result of the fire when they knew that they had stored numerous valuable items in rented space. The removal of their pets from the home prior to the fire was also of significance.

We reject Suzanne's argument that the expert testimony that the fire had started in the basement was against the weight of the evidence. Her argument is "directed toward the weight and credibility of the evidence, 'a matter wholly within the province of the jury.' " *Commonwealth* v. *Thompson*, 431 Mass. 108, 114 (2000), quoting from *Commonwealth* v. *Martino*, 412 Mass. 267, 272 (1992).

In regard to both indictments, "[w]e think that a 'sufficient "chain of circumstances" — composed of evidence of motive, opportunity, control of the premises, increase in insurance, concealment and misleading statements — was forged, allowing the [jury] to find that [James and Suzanne] . . . willfully and maliciously set the fire' " with the intent to defraud the insurer. *Commonwealth* v. *Jacobson*, 19 Mass. App. Ct. at 674, quoting from *Commonwealth* v. *DeStefano*, 16 Mass. App. Ct. at 217.

2. *Ineffective assistance of counsel.* Suzanne claims that trial counsel was constitutionally ineffective because he questioned Williams about his opinion that an accelerant had been placed on the basement stairs. According to Suzanne, her counsel's questions were improper because they "opened the door" for the prosecutor to question Williams on the subject even after the judge had allowed a motion in limine to exclude testimony on the topic.

The motion to which Suzanne referred was a motion filed by James's lawyer. The motion acknowledges that in his report Williams states, among other things, that the stairs leading from the basement indicated a "pooling of an accelerant." The motion requested that the judge exclude "any other opinions of . . . Williams including an opinion that the cause of [the] fire was incendiary."

At no time did Williams or any other expert testify that the fire was intentionally set. The judge did allow Williams to give an opinion about the condition of the stairs and the appearance of accelerant on it at the time of the fire and that he had seen similar conditions in arson-related fires in Chelsea.

An attorney's tactical decisions amount to ineffective assistance of counsel only if they were manifestly unreasonable when made. *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998). Trial counsel's decision to cross-examine Williams was reasonable. It was incumbent upon defense counsel to challenge the validity and reliability of Williams's opinion that the fire had started in the basement and was not an accident resulting from unattended cooking in the kitchen. We conclude that trial counsel was not ineffective.

*Judgments affirmed.*